SC

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Craig Murray Jones, | ) | No. CV 13-0099-PHX-DGC (LOA) |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Jeff Alvarez, et al., | ) | |
| Defendants. | ) | |

Plaintiff Craig Murray Jones, who is confined in Maricopa County's Fourth Avenue Jail in Phoenix, Arizona, filed a *pro se* civil rights Complaint pursuant to 42 U.S.C. § 1983 and an Application to Proceed *In Forma Pauperis*.  Plaintiff later filed a motion for appointment of counsel, a supplement, declarations, a notice, and affidavits.  (Doc. 5-11.) The Court will order Defendants Barker, Gaskins, and Johnson to answer Count I of the Complaint and will dismiss the remaining Defendants without prejudice.  The Court will deny Plaintiff's motion and other filings to the extent that any relief is sought therein.

**I.     Application to Proceed *In Forma Pauperis* and Filing Fee**

Plaintiff's Application to Proceed *In Forma Pauperis* will be granted.  28 U.S.C. § 1915(a).  Plaintiff must pay the statutory filing fee of $350.00.  28 U.S.C. § 1915(b)(1). The Court will not assess an initial partial filing fee.  28 U.S.C. § 1915(b)(1).  The statutory fee will be collected monthly in payments of 20% of the previous month's income each time the amount in the account exceeds $10.00.  28 U.S.C. § 1915(b)(2).  The Court will enter a separate Order requiring the appropriate government agency to collect and forward the fees according to the statutory formula.

TERMPSREF

## II.      Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id.</u> at 1950.  Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. <u>Id.</u> at 1951.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." <u>Hebbe v. Pliler</u>, 627 F.3d 338, 342 (9th Cir. 2010).  A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" <u>Id.</u> (quoting <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (*per curiam*)).

/      /      /

1  **III.    Complaint**

2      Plaintiff alleges one count for denial of constitutionally-adequate medical care.

3  Plaintiff sues 29 Defendants, who work, or worked, for Maricopa County's Correctional

4  Health Service (CHS).  They include the following named Defendants: Medical Director Jeff

5  Alvarez, M.D.; External Hearing Officer Lourdes Hernandez; Risk Management Division

6  Supervisor John Doe; Health Care Provider (HCPs) Drs. Richard D. Friedman (CH102),

7  Monica Gaskins (CH109), Craig Belcourt, Ian Kramer, and Unknown First Name Davis;

8  Physician's Assistants (PAs), Matt Barker (CH038), Barry Johnson (CH106), and Erica

9  Saretsky (CS121)[1]; and Licensed Practical Nurse (LPN) Pam Brooks (CH718).[2]  Plaintiff

10  also sues 12 staff-members whom he labels "triage nurses" and whom he identifies as John

11  Doe with their badge or employee numbers: LS865, CS995, CS959, CS157, CS533, RT125,

12  CH606 or 686, CH741, HS556, HS217, CS565, and HS212.  Plaintiff sues another four John

13  Does who responded to certain Health Needs Requests (HNRs) by the control numbers on

14  those HNRs, as follows, Doe 138776, Doe 182045, Doe 182409, and Doe 185336.[3]  Finally,

15  Plaintiff sues an Evening Pill Pass Nurse named Norma, whom he identifies as John Doe

16  (hereafter Norma Doe).  Plaintiff seeks injunctive, compensatory, and punitive relief.

17      Plaintiff alleges the following facts in his Complaint: Plaintiff is a 60-year old

18

19

20

21      [1]   Information available on-line from the Arizona Medical Board reflect that

22  Friedman, Gaskins, and Belcourt are all medical doctors.  There was no listing for Ian
   Kramer and it is unclear without a first name whether Davis is or was a physician or a PA..

23  Defendants Johnson and Saretsky are PAs, rather than doctors.  See http://www.azmd.gov/
   glsuiteweb/clients/azbom/Public/Profile.aspx?entID=1618086&licID=262750&licType=1

24  (last visited June 13, 2013).

25
       [2]  Plaintiff does not consistently refer to particular Defendants either by their names

26  and/or identification numbers.  Further, he refers to numerous Defendants as John Doe
   without separately differentiating between the particular Doe Defendants.

27
       [3]   It is unclear whether one or more persons responded to these HNRs, and thus,

28  whether four persons or fewer than four persons are being sued.

seriously mentally ill (SMI) inmate.[4]  On October 5, 2010, prior to incarceration, Plaintiff was involved in a car accident that resulted in cervical, thoracic, and lumbar sprain or strain; disc displacement; myalgia/hypertonicity; neuralgia; neuritis; radiculitis; and lumbar intervertebral disc disorder.  Prior to confinement, Plaintiff received physical therapy and narcotic pain relievers, which significantly or substantially alleviated continuing pain as a result of his injuries.  Since June 23, 2011, Plaintiff has been incarcerated in Maricopa County jails and the balance of his allegations primarily concern his repeated requests for treatment of pain stemming from the physical injuries he suffered in the October 5, 2010 accident.

Upon arrival at the Fourth Avenue Jail, Plaintiff informed "intake" that he was SMI and that he had missed several doses of psychiatric medications because of his detention and, shortly thereafter, apparently notified staff of his back injuries.[5]  On June 26, 2011, Plaintiff submitted an HNR complaining of severe pain as a consequence of the 2010 accident and stating that available medical records would document his injuries.  "Defendant John Doe # __" evaluated Plaintiff but did not "address" Plaintiff's pain by, for example, giving Plaintiff hot-packs or rubbing cream, nor did he request Plaintiff's medical records.  (Doc. 1 at 3C.)  In a June 30, 2011 HNR, Plaintiff reported that he was in serious pain and asked to see a doctor.  "John Doe # __" responded to this HNR, but did not address Plaintiff's pain. (Id.)  On July 7, 2011, Plaintiff, in tears, pleaded with Defendant Doe CS995 to help him with his pain; Doe CS995 provided him a blanket.

In a July 19, 2011 HNR, Plaintiff again reported that he was suffering from serious pain and asked why he had not been seen by a doctor for his back.  "John Doe # __" passed the HNR on to someone else without attempting to alleviate Plaintiff's pain to the extent that Doe could.  (Id.)  On July 30, 2011, Plaintiff's pain caused him to vomit.  Plaintiff submitted

---

[4] Elsewhere, Plaintiff indicates that he suffers from Post-Traumatic Stress Disorder (PTSD).

[5]  Plaintiff does not appear to seek relief with respect to treatment of his mental illness(es).

1   another HNR again asking to see a doctor concerning his pain. "John Doe # ___" again

2   passed the HNR on to someone else. (Id.)

3          In an August 8, 2011 HNR, Plaintiff pleaded for pain relief and to see a doctor until

4   CHS obtained his medical records. According to Plaintiff, "John Doe # _" could have done

5   "something," but did not. (Id.) Plaintiff sent for his medical records himself because his pain

6   was becoming unendurable and the continued lack of treatment was reversing progress he

7   had made prior to incarceration.  Plaintiff received HNR responses stating that he was

8   scheduled to see a doctor, but Plaintiff claims that he did not.

9          On October 3, 2011, Plaintiff brought his medical records to an appointment at which

10  he was seen by HCP "John Doe # _". (Id.) "John Doe # _" referred Plaintiff to an outside

11  orthopedic specialist, but he did not alleviate Plaintiff's pain and "ignored" Plaintiff's

12  medical records. (Id. at 3C-3D.) Plaintiff contends that "John Doe # ___" could have

13  prescribed over-the-counter pain relievers, but did not. (Id.) Plaintiff does not allege that he

14  requested pain medication or that he was unable to purchase over-the-counter pain relievers

15  from the commissary.

16         On October 12, 2011, Plaintiff was evaluated by an outside orthopedic specialist who

17  ordered Ultram, a non-narcotic analgesic,[6] and Flexeril, a muscle relaxant,[7] Baclofen[8], and

18  epidural injections.  In an October 15, 2011 HNR, Plaintiff reported that he had seen an

19  _____

20         [6] According to information available on-line from the National Institutes of Health,

21  Ultram©, or Tramadol, is used "to relieve moderate to moderately severe pain."  See
    http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (Last visited June 3,

22  2013).

23         [7] Flexeril© is a muscle relaxant, which should not be taken for more than three weeks

24  without conferring with the treating physician, and requires special precautions for persons
    suffering from various conditions, taking other medications, and/or more than 65 years of

25  age.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (Last visited
    June 3, 2013).

26

27         [8] "Baclofen acts on the spinal cord nerves and decreases the number and severity of
    muscle spasms caused by multiple sclerosis or spinal cord diseases.  It also relieves pain and

28  improves muscle movement."  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/
    a682530.html (last visited June 3, 2013).

outside the orthopedic specialist, who had issued written recommendations for treatment, and asked if he was going to be seen for his serious pain.  Staff member RT251 responded "Follow up appt. with ortho scheduled." (Id. at 3D.)

In a November 1, 2011 HNR, Plaintiff reported that Ultram and Baclofen were not effective in alleviating his pain and that Flexeril had never been dispensed.[9]  In a November 5, 2011 response, Defendant Barker informed Plaintiff that Ultram and Baclofen were being discontinued based on Plaintiff's report that they were ineffective. (Id.) Plaintiff apparently then complained about the failure to prescribe alternative medications, such as those he had taken prior to his incarceration, which had been effective. (Id.) "John Doe #__" responded by telling Plaintiff that he was "saying the same thing." (Id.)  Plaintiff contends that Doe ignored the record and failed to investigate the situation enough to make an informed decision.

In a December 1, 2011 HNR, Plaintiff sought a referral for epidural injections recommended by the outside specialist on October 10, 2011.  Defendant Doe CH606 (or 686) responded that Plaintiff was scheduled to be seen.  Plaintiff contends that Doe CH606 should have been aware from Plaintiff's medical records of the severe pain he was suffering, that prior effective pain treatment had ended upon his incarceration, and that there had been significant delay since the injections had been recommended.  On December 26, 2011, after still not having been seen since his December 1 HNR, Plaintiff submitted an HNR in which he reported that his pain was "unbearable" and asked to be informed of the status of the scheduled appointment. (Id.) Defendant Doe CS157 responded that "Your M.R.I. was done Dec. 20, 2011, Please be patient" and that "Your appointment is comming [sic]." (Id.) Because he had not received an MRI in December 2011, Plaintiff feared that CS157 was referring to another inmate's MRI or was referring to Plaintiff's pre-incarceration MRI, which would not show any degenerative changes since incarceration.  On December 29, 2011, Doe RT984 clarified that CS157 had referred to Plaintiff's pre-incarceration MRI.  In

---

[9] Plaintiff does not allege when or for how long he took the medications.

a December 30, 2011 HNR, Plaintiff reported that he was considering legal action due to the delay in treatment for his serious pain.  Defendant Doe CS157 responded that Plaintiff had an appointment scheduled.

On January 13, 2012, "John Doe #___" prescribed Plaintiff Soma, a non-narcotic muscle relaxant, for 30 days.  (Id. at 3E.)  Plaintiff was told to submit an HNR requesting "renewal" before the end of the 30 days.  Soma significantly reduced Plaintiff's pain level and Plaintiff did not submit HNRs concerning his pain while he received Soma.

In a February 8, 2012 HNR, Plaintiff requested a renewal of the Soma prescription, which was due to expire on February 14, 2012.  Although Plaintiff had not complained of pain while taking Soma, Defendant Barker denied the renewal without providing an alternative medication for pain.

By February 12, 2012, Plaintiff was again suffering serious pain after Soma was discontinued.[10]  Plaintiff asked that it be renewed or to see a doctor.  Defendant Doe CH741 responded that "Soma renewal was denied by provider on 2/9/2012." (Id.)  On February 14, 2012, Plaintiff "made it clear to CHS" that the discontinued "meds" had been working well and that he had been able to assist his attorney, but was again suffering pain without the medications.  Defendant Brooks responded that Plaintiff had to put in a renewal HNR for medications.  In a February 16, 2012 HNR, Plaintiff again requested a renewal of Soma, but Brooks responded that renewal had been denied.

On March 1, 2012, "John Doe" or "John Doe #1" evaluated Plaintiff and told him of Soma's addictive properties and declined to prescribe Soma, despite Plaintiff's effective pre-incarceration treatment with Hydrocodone and Oxycontin without adverse effects.  (Id. at ¶¶ 13, 60.)  "Later," apparently the same day or March 2, Plaintiff received three epidural injections for pain and the treatment specialist, apparently Dr. Page, also recommended

---

[10]  Plaintiff does not explain the discrepancy between his allegation that his Soma prescription was due to expire on February 14, 2012, and his allegation that he was in severe pain due to the discontinuation of Soma prior to February 14, 2012.

Soma.[11]

In an April 1, 2012 HNR, Plaintiff reported that he was again in pain and that it had been several weeks since he had seen the specialist. PA Saretsky (CS121) responded "referral in Progress for [follow-up]." (Id.) In an April 9, 2012 HNR, Plaintiff asked when he would see the treatment specialist and stated that he was in serious pain. "John Doe #__" responded that an appointment was scheduled. (Id.)

Beginning April 17, 2012, Plaintiff received Soma for two weeks. According to Plaintiff, although an unidentified person again ordered Soma on May 1, 2012, Plaintiff was actually given Flexeril.[12] In a May 5, 2012 HNR, Plaintiff asked why he was receiving Flexeril rather than Soma, when Soma had effectively relieved his pain and Flexeril did not.

On June 11, 2012, a treatment specialist ordered or recommended Soma for Plaintiff. In a June 18, 2012 HNR, Plaintiff asked to see a doctor because he had not seen a doctor in months and he wanted to know about any changes in treatment. PA Johnson responded that a follow-up had been requested. In a June 27, 2012 HNR, Plaintiff stated that he could not go to an appointment with the pain specialist because he had a court hearing the following day and did not want to be "drugged up for court."[13] (Id. at 3F.) "CHS" responded that the appointment was scheduled. (Id.)

In a July 15, 2012 HNR, Plaintiff asked when the June 11 prescription for Soma would be filled. HS556 responded that "we are awaiting additional documentation from pain

---

[11] "An epidural steroid injection (ESI) is the delivery of powerful anti-inflammatory medicine directly into the space outside of the sac of fluid around your spinal cord. This area is called the epidural space." Http://www.nlm.nih.gov/medlineplus/ency/article/007485.htm (last visited June 12, 2013). "Epidural steroid injections provide short-term pain relief for at least half of the people who receive them. Symptoms may remain better for weeks to months, but rarely up to a year." Id.

[12] Plaintiff states that Soma was ordered for four days, but Soma was not dispensed to him.

[13] Plaintiff indicates that the residual effects of anesthesia used in administering injections lasted for some time after a treatment.

management office."[14] (Id.)  In a July 31, 2012 HNR, Plaintiff stated that he was in pain and asked why he was not receiving Soma.  PA Saretsky (CS121) responded that "Your [sic] were seen by provider on 7/23/12 and this issue was discussed with you," and that "if you are in pain, I suggest not refusing your options provided."  (Id.)  Plaintiff contends the response was designed to make it appear that he was in pain because he refused proffered alternatives, but that he had declined the alternatives because they had been "historically ineffective" in treating his pain.  (Id.)  Plaintiff fails to describe when or whom he saw on July 23, 2012, or what occurred.

In an August 6, 2012 HNR, Plaintiff warned that he was preparing to file a grievance regarding CHS's failure to treat his back injury and pain.  HS556 responded that Plaintiff was scheduled to be seen.  On August 15, 2012, Plaintiff filed grievance 12-08667.  In an August 31, 2012 HNR, Plaintiff requested use of a wheelchair for an upcoming court hearing because he was unable to walk to court due to pain caused by walking in shackles.  "CHS" responded that a visit would be scheduled.

In a September 1, 2012 HNR, Plaintiff asked to see a provider regarding pain from a knee injury that was getting worse.  HS217 responded that Plaintiff was scheduled to be seen.  In a September 5, 2012 HNR, Plaintiff complained that he had been woken up to go to a pain management appointment, but he had never been taken.

In a September 7, 2012 HNR, Plaintiff "pleaded" to see a provider about his pain.  (Id. at 3G.)  Defendant Barker responded "s/c sched."  (Id.)  In a September 11, 2012 HNR, Plaintiff asked to see a provider for pain.  In response, he was told that an appointment was scheduled.  In a September 14, 2012 HNR, Plaintiff again complained of pain and asked why CHS refused to provide prescribed pain medication; Plaintiff fails to identify the medication to which he refers or when and by whom it was prescribed.  HS217 responded that Plaintiff

---

[14]  In a July 17, 2012 HNR, Plaintiff complained about having to sign a medical release to receive a copy of the prescription.  In response, CH640 stated that Plaintiff needed to sign a release and send it to medical records to get the copies.  On July 19, 2012, Plaintiff filed another HNR complaining about the response to his July 17 HNR.  HS212 responded to this HNR by stating that Plaintiff was scheduled to be seen.

1   was scheduled to be seen.

2        On September 18, 2012, Dr. Gaskins saw Plaintiff and ordered Soma to be provided

3   two weeks on and two weeks off.  On the basis that it would be, Plaintiff agreed to dismiss

4   his pending grievance as resolved.  The next day, a Memorandum from the Risk Management

5   Division to External Hearing Officer Hernandez stated that Plaintiff was being prescribed

6   Soma, that he had agreed to a two week on, two week off Soma regimen, and that his

7   grievance was dismissed.  However, Plaintiff did not receive Soma ordered by Dr. Gaskins.

8   In a September 25, 2012 HNR, Plaintiff accused CHS of showing deliberate indifference by

9   falsely purporting to have resolved his grievance and by failing to provide him a wheelchair.

10  Defendant Brooks responded that "medication was discontinued, wheelchair is ordered." (Id.)

11       In a September 28, 2012 HNR, Plaintiff asked to see a provider.  RT580 responded that

12  on September 25, 2012 Soma was discontinued because it was not available as it was a "non-

13  formulary" medication.  (Id.)  Plaintiff submitted another HNR the same day asking to see his

14  medical records; this HNR was returned.

15       In an October 5, 2012 HNR, Plaintiff reported that his pain was out of control and that

16  he could not sleep.  HS212 responded that he was scheduled to be seen.  On October11, 2012,

17  Dr. Gaskins ordered "a thermal undershirt" for Plaintiff and agreed to speak to the medical

18  director about an exception being made so that Plaintiff could receive Soma.[15]  Dr. Gaskins

19  also suggested alternative medications, including Vicodin, to Plaintiff, but Plaintiff apparently

20  rejected those alternatives at that time.

21       In an October 15, 2012 HNR, Plaintiff complained about not receiving the thermal

22  undershirt.  HS217 responded that while Medical had ordered the undershirt, the sheriff's

23  department had to provide it and it no longer gave them out.  In an October 17, 2012 HNR,

24  Plaintiff reported that he was in excruciating pain and noted that Dr. Gaskins had agreed to

25  ask the medical director to approve Soma.  Plaintiff asked to see Dr. Gaskins because his pain

26

27       [15]  According to Plaintiff, he did not receive the undershirt until he filed a grievance.

28  Even then, the undershirt was later taken from him and never returned.  Plaintiff does not
    allege when this occurred.

1   was affecting his underlying Post-Traumatic Stress Disorder (PTSD).  In an October 18, 2012

2   HNR, Plaintiff reported that Dr. Gaskins had ordered him a thermal undershirt, but when he

3   asked Nurse Norma Doe about it, Doe responded that "Dr. Gaskins is crazy" and "doing

4   things she shouldn't be doing."  (Id. at 3H.)  Plaintiff stated that he intended to include the

5   incident in a lawsuit if he did not receive the undershirt.  Plaintiff received an unsigned

6   response stating that the sheriff's department would not provide the thermal until November.

7   In an October 22, 2012 HNR, Plaintiff asked why he was not receiving responses to his

8   requests, asked about the grievance agreement that had not been honored, and reported that

9   he was suffering from agonizing pain.  Brooks responded that medical did not provide thermal

10  undershirts and did not otherwise address his complaints.

11       In an October 25, 2012 HNR, Plaintiff again reported unbearable pain.  HS212

12  responded that he had discussed the issue with Dr. Gaskins; HS212 stated that Plaintiff had

13  "declined and refused all other meds available and offered for your pain.  Should you

14  reconsider and want one of the meds offered, state the name you want ...."  (Id.)  In an

15  October 26, 2012 HNR, Plaintiff asked to see Dr. Gaskins again because he believed that he

16  was being forced to choose from ineffective medications to address his pain.  HS212

17  essentially repeated his previous response.

18       In an October 30, 2012 HNR, Plaintiff stated that he would consider taking Vicodin,

19  which Dr. Gaskins had suggested on October 11, 2012, if it was prescribed at an effective

20  dose – Plaintiff explained that he had previously been prescribed one pill every 12 hours, but

21  the manufacturer suggested two pills every 6 to 8 hours.[16]  This HNR was forwarded to PA

22  Johnson.  PA Johnson replied that he saw "nothing for extra strength Vicodin for the duration.

23  You have stated in the past that Vicodin does not work."  (Id.)  PA Johnson also suggested

24  that Plaintiff buy over-the-counter pain relievers from the commissary.  Plaintiff contends that

25  PA Johnson's reply was non-responsive and deliberately misstated his request.

26       On November 1, 2012, Plaintiff was given a "Patient Registration Form" to complete,

27  ────────────

28       [16]   Plaintiff does not allege the dosage he previously received or the dosage
     recommended, if any, by Dr. Gaskins.

1  which was to be sent to a new pain specialist.  Plaintiff completed the form and submitted it

2  with a November 5, 2012 HNR, in which he sought information regarding whether the

3  epidural injections he had received were part of a contaminated lot of such injections that

4  resulted in a number of meningitis deaths around the country.  Defendant Brooks told Plaintiff

5  that he had to ask Dr. Page, the pain specialist who had administered his epidural injections.

6      In a November 12, 2012 HNR, Plaintiff asked when he would be seen for his serious

7  pain.  HS556 responded that Plaintiff was scheduled to be seen.  Plaintiff saw the new pain

8  specialist on November 15, 2012.  In a November 16, 2012 HNR, Plaintiff asked to see an

9  HCP about his pain and to discuss his visit with the new pain specialist.  Plaintiff described

10 the consultation with the new specialist as useless and an effort to keep him in pain.

11 Apparently the new specialist had recommended nerve blocks, but had not recommended

12 Soma, unlike Dr. Page.  HS556 responded that Plaintiff was already scheduled to be seen.

13 **V.     Failure to State a Claim**

14      To state a claim under § 1983, a plaintiff must allege facts supporting that (1) the

15 conduct about which he complains was committed by a person acting under the color of state

16 law and (2) the conduct deprived him of a federal constitutional or statutory right.  Wood v.

17 Outlander, 879 F.2d 583, 587 (9th Cir. 1989).  Negligence is not sufficient to state a claim

18 under § 1983.  Daniels v. Williams, 474 U.S. 327, 330-31 (1986).  In addition, a plaintiff must

19 allege that he suffered a specific injury as a result of the conduct of a particular defendant and

20 he must allege an affirmative link between the injury and the conduct of that defendant.  Rizzo

21 v. Goode, 423 U.S. 362, 371-72, 377 (1976).

22      Plaintiff alleges a single claim for denial of constitutionally-adequate medical care.

23 Not every claim by a prisoner relating to inadequate medical treatment states a violation of

24 the Eighth or Fourteenth Amendment.  To state a § 1983 medical claim, a plaintiff must show

25 that the defendants acted with "deliberate indifference to serious medical needs."  Jett v.

26 Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104

27 (1976)).  A plaintiff must show (1) a "serious medical need" by demonstrating that failure to

28 treat the condition could result in further significant injury or the unnecessary and wanton

1   infliction of pain and (2) the defendant's response was deliberately indifferent.  Jett, 439 F.3d

2   at 1096 (quotations omitted).

3        "Deliberate indifference is a high legal standard."  Toguchi v. Chung, 391 F.3d 1051,

4   1060 (9th Cir. 2004).  To act with deliberate indifference, a prison official must both know

5   of and disregard an excessive risk to inmate health; "the official must both be aware of facts

6   from which the inference could be drawn that a substantial risk of serious harm exists, and he

7   must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Deliberate

8   indifference in the medical context may be shown by a purposeful act or failure to respond

9   to a prisoner's pain or possible medical need and harm caused by the indifference.  Jett, 439

10  F.3d at 1096.  Deliberate indifference may also be shown when a prison official intentionally

11  denies, delays, or interferes with medical treatment or by the way prison doctors respond to

12  the prisoner's medical needs.  Estelle, 429 U.S. at 104-05; Jett, 439 F.3d at 1096.

13       Deliberate indifference is a higher standard than negligence or lack of ordinary due

14  care for the prisoner's safety.  Farmer, 511 U.S. at 835.  "Neither negligence nor gross

15  negligence will constitute deliberate indifference."  Clement v. California Dep't of Corr., 220

16  F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); see also Broughton v. Cutter Labs., 622 F.2d 458,

17  460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"

18  do not support a claim under § 1983).  "A difference of opinion does not amount to deliberate

19  indifference to [a plaintiff's] serious medical needs."  Sanchez v. Vild, 891 F.2d 240, 242 (9th

20  Cir. 1989).  A mere delay in medical care, without more, is insufficient to state a claim against

21  prison officials for deliberate indifference.  See Shapley v. Nevada Bd. of State Prison

22  Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.  The

23  action must rise to a level of "unnecessary and wanton infliction of pain."  Estelle, 429 U.S.

24  at 105.

25       **A.    Fictitiously-Identified Defendants**

26       Plaintiff sues various fictitiously-identified Defendants.  Most such Defendants are

27  identified by their position, such as Risk Management Division Supervisor John Doe, or as

28  John or Jane Doe followed by their badge or control number.  Plaintiff's allegations against

1   these Doe Defendants are discussed further below.  However, Plaintiff also attributes many

2   allegations to "Defendant John Doe # _", "John Doe # __", HCP "John Doe # _", "John Don

3   #___", or "John Doe #".  The Court is unable to discern whether such allegations refer to a

4   single individual or to multiple individuals.  Plaintiff also largely fails to allege the positions

5   held by these Doe Defendants.

6        Rule 10(a) of the Federal Rules of Civil Procedure requires the plaintiff to include the

7   names of the parties in the action.  As a practical matter, it is impossible in most instances for

8   the United States Marshal or his designee to serve a summons and complaint or amended

9   complaint upon an anonymous defendant.

10        The Ninth Circuit has held that where identity is unknown prior to the filing of a

11   complaint, the plaintiff should be given an opportunity through discovery to identify the

12   unknown defendants, unless it is clear that discovery would not uncover the identities, or that

13   the complaint would be dismissed on other grounds.  Wakefield v. Thompson, 177 F.3d 1160,

14   1163 (9th Cir. 1999) (citing Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980)).  Where

15   the names of individual defendants are unknown at the time a complaint is filed, a plaintiff

16   may refer to the individual unknown defendants as Defendant John (or Jane) Doe 1, John Doe

17   2, and so on, *and* allege facts to support how each particular Doe defendant violated the

18   plaintiff's constitutional rights, including when, where, and how.  A plaintiff may thereafter

19   use the discovery process to obtain the names of fictitiously-named defendants whom he

20   believes violated his constitutional rights and seek leave to amend to name those defendants.

21   Because the Court is unable to discern whether Plaintiff's Doe Defendant allegations refer to

22   a single individual or to multiple individuals, and Plaintiff therefore has not alleged facts to

23   support how each particular Doe Defendant violated his rights, Defendants John Doe # _",

24   "John Doe # _", HCP "John Doe # _", "John Don #__", and "John Doe #" will be dismissed

25   without prejudice.

26        **B.    Other Defendants**

27        Plaintiff also sues numerous other Defendants.  To state a claim against a defendant,

28   "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was

1   personally involved in the deprivation of his civil rights." Barren v. Harrington, 152 F.3d

2   1193, 1194 (9th Cir. 1998).  For an individual to be liable in his official capacity, a plaintiff

3   must allege that the official acted as a result of a policy, practice, or custom.  See Cortez v.

4   County of Los Angeles, 294 F.3d 1186, 1188 (9th Cir. 2001).  Further, there is no *respondeat*

5   *superior* liability under § 1983, so a defendant's position as the supervisor of someone who

6   allegedly violated a plaintiff's constitutional rights does not make him liable. Monell v. Dep't

7   of Soc. Servs., 436 U.S. 658, 691 (1978); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

8   A supervisor in his individual capacity, "is only liable for constitutional violations of his

9   subordinates if the supervisor participated in or directed the violations, or knew of the

10  violations and failed to act to prevent them." Taylor, 880 F.2d at 1045.  In addition, where

11  a defendant's only involvement in allegedly unconstitutional conduct is the denial of

12  administrative grievances, the failure to intervene on a prisoner's behalf to remedy the alleged

13  unconstitutional behavior does not amount to active unconstitutional behavior for purposes

14  of § 1983.  See Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999); accord Proctor v.

15  Applegate, 661 F.Supp.2d 743,  765 (W.D. Mich. 2009); Stocker v. Warden, No. 1:07-CV-

16  00589, 2009 WL 981323, at *10 (E.D. Cal. Apr. 13, 2009); Mintun v. Blades, No. CV-06-

17  139, 2008 WL 711636, at *7 (D. Idaho Mar. 14, 2008); see also Gregory v. City of Louisville,

18  444 F.3d 725, 751 (6th Cir. 2006) (a plaintiff must allege that a supervisor defendant did more

19  than play a passive role in an alleged violation or mere tacit approval thereof; a plaintiff must

20  allege that the supervisor defendant somehow encouraged or condoned the actions of their

21  subordinates).

22      **1.**   **Friedman, Belcourt, Kramer, Davis, LS865, CS959, CS533, Doe 182045,**
              **& Doe 182409**

23

24      Plaintiff sues named Defendants Friedman, Belcourt, Kramer, and Davis, as well as

25  Does LS865, CS959, CS533, 182045, and 182409.  While these Defendants may be sued

26  under § 1983, Plaintiff fails to allege any facts against these Defendants.  Plaintiff neither

27  alleges facts to support that any of these Defendants directly violated his constitutional rights,

28  nor facts to support that any of them promulgated, condoned, or endorsed the violation of

1  Plaintiff's constitutional rights.  Plaintiff's assertions against "Defendants" generally are

2  vague and conclusory and insufficient to state a claim against these Defendants.  Although

3  *pro se* pleadings are liberally construed, <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972),

4  conclusory and vague allegations will not support a cause of action.  <u>Ivey v. Board of Regents</u>

5  <u>of the Univ. of Alaska</u>, 673 F.2d 266, 268 (9th Cir. 1982).  Further, a liberal interpretation of

6  a civil rights complaint may not supply essential elements of the claim that were not initially

7  pled.  <u>Id.</u>  Accordingly, these Defendants will be dismissed.

8        **2.    Alvarez, CHS Risk Manager Doe, Hernandez, Norma Doe, Saretsky, &**

9                **Brooks**

10        Plaintiff alleges that Alvarez together with Hernandez and CHS Risk Management

11  Supervisor Doe co-ordinated efforts to make it appear that grievances were resolved, when

12  they were not.  Even if true, that absent more, does not state a constitutional claim against

13  Alvarez, Hernandez, or Doe.  Plaintiff also alleges as to Supervisor Doe and Hernandez that

14  a September 19, 2012 Memorandum from the Risk Management Division to Hernandez stated

15  that Plaintiff was being prescribed Soma, that he had agreed to a two week on, two week off

16  Soma regimen, and that his grievance was dismissed.  Plaintiff does not allege that Supervisor

17  Doe authored the Memorandum or how doing so violated Plaintiff's constitutional rights.

18  Similarly, Plaintiff fails to allege facts to support that Hernandez in any way violated his

19  constitutional rights.  Accordingly, Plaintiff also fails to state a claim against Supervisor Doe

20  and Hernandez and they will be dismissed.

21        Plaintiff alleges that when he asked Defendant Norma Doe about Dr. Gaskins' ordering

22  him a thermal undershirt, she responded that "Dr. Gaskins is crazy" and "doing things she

23  shouldn't be doing."  (<u>Id.</u> at 3H.)  Norma Doe's response, absent other facts, does not rise to

24  the level of a constitutional violation.  Accordingly, Defendant Norma Doe will be dismissed.

25        Plaintiff alleges that PA Saretsky responded to his July 31, 2012 HNR asking why he

26  was not receiving Soma by stating that he had been seen on July 23, 2012, when alternatives

27  to Soma had been discussed.  She suggested that Plaintiff consider one of the alternatives to

28  Soma.  Saretsky did not thereby act with deliberate indifference to Plaintiff's medical needs

1 and did not deny or refuse treatment. Therefore, Plaintiff fails to state a claim against her and
2 she will be dismissed.

3       Plaintiff alleges that Brooks responded to grievances and dispensed medications.
4 According to Plaintiff, Brooks responded to his February 14, 2012 HNR by telling him that
5 he had to submit an HNR for renewal of Soma, apparently unaware or overlooking that
6 Plaintiff had already done so and been denied renewal. Her response, absent more, was
7 merely negligent. Brooks responded to his February 16, 2012 HNR by stating that renewal
8 of Soma had been denied. She responded to Plaintiff's September 25, 2012 HNR requesting
9 a wheelchair and Soma by stating that the Soma had been discontinued and a wheelchair had
10 been ordered. She responded to Plaintiff's October 22, 2012 HNR complaining of agonizing
11 pain by stating that Medical did not have thermals to provide. She responded to his
12 November 5, 2012 HNR seeking information regarding a meningitis outbreak by suggesting
13 that Plaintiff contact the outside physician who administered the epidurals. Whatever the
14 short-comings of her responses, Brooks did respond to the above HNRs. Absent other
15 allegations, Brooks did not act with deliberate indifference to Plaintiff's medical needs.
16 Accordingly, Plaintiff fails to state a claim against Brooks and she will be dismissed.

17       **3.**     **RT125, CS565, CS995, CS157, CH606 (686), CH741, HS556, HS217, CS565, HS212, Doe 138776, & Doe 185336**
18

19       Plaintiff sues RT125, CS565, CS995, CS157, CH606 (686), CH741, HS556, HS217,
20 CS565, HS212, Doe 138776, and Doe 185336. He largely faults these Defendants for their
21 responses to various HNRs. Plaintiff in part faults these Defendants for responding that he
22 was scheduled to be seen by an HCP or outside provider, rather than or in addition to
23 attempting to alleviate his pain. Plaintiff fails to allege facts to support that any of these
24 Defendants were medically qualified or authorized to treat his serious pain issues. This is
25 particularly true where Plaintiff was repeatedly referred to outside pain specialists and/or
26 orthopedists for treatment. Plaintiff does not allege facts to support that the provision of ice-
27 packs, thermals, or other over-the-counter treatment would effectively alleviate his pain or
28 that any of these Defendants knew or should have known that the failure to provide such

1   treatment was likely to exacerbate Plaintiff's condition.  Nor do Plaintiff's allegations support

2   that they failed to take some action to have his medical issues addressed, i.e., by scheduling

3   him to see medical staff.  As such, Plaintiff fails to allege facts to support that they acted with

4   deliberate indifference.  Accordingly, these Defendants will be dismissed.

5        **C.    Grievance Allegations**

6        Plaintiff asserts a conspiracy to manipulate or distort the handling and resolution of his

7   jail grievances and non-compliance by Defendants with jail grievance procedures.  "There is

8   no legitimate claim of entitlement to a [jail] grievance procedure."  <u>Mann v. Adams</u>, 855 F.2d

9   639, 640 (9th Cir. 1988).  But if there is an established grievance procedure, the denial of

10  access to the grievance process *may* state a constitutional violation.  <u>Bradley v. Hall</u>, 64 F.3d

11  1276, 1279 (9th Cir. 1995), <u>abrogated on other grounds by</u> <u>Shaw v. Murphy</u>, 532 U.S. 223

12  (2001); <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1138 (9th Cir. 1989).  The "government"

13  to which the First Amendment guarantees a right to petition for redress of grievances includes

14  jail authorities.  <u>Hall</u>, 64 F.3d at 1279 (citing <u>Soranno's Gasco, Inc. v. Morgan</u>, 874 F.2d

15  1310, 1314 (9th Cir.1989)).  It does not, however, entitle a prisoner to a particular resolution

16  of a grievance.

17       Plaintiff does not allege that he was denied access to an available jail grievance

18  procedure.  Rather, he alleges that various Defendants failed to comply with jail grievance

19  procedures or to comply with resolutions of his grievances.  That is not sufficient to state a

20  claim for violation of Plaintiff's constitutional rights.  Accordingly, such allegations will be

21  dismissed.

22       **D.    Conspiracy**

23       Plaintiff also asserts a conspiracy to violate his constitutional rights.  Conclusory

24  allegations of a conspiracy are insufficient to state a claim.  <u>See</u> <u>Franklin v. Fox</u>, 312 F.3d

25  423, 441 (9th Cir. 2002) (explaining the requirements of a conspiracy claim under § 1983);

26  <u>Sprewell v. Golden State Warriors</u>, 266 F.3d 979, 988 (9th Cir.) (we need not "accept as true

27  allegations that are merely conclusory, deductions of fact, or unreasonable inferences"),

28  <u>amended on other grounds</u>, 275 F.3d 1187 (9th Cir. 2001); <u>Woodrum v. Woodward County</u>,

866 F.2d 1121, 1126 (9th Cir. 1989) (stating that conclusory allegations of conspiracy do not support a § 1983 claim).

Plaintiff fails to allege facts to support a meeting of the minds, or agreement, between or among individual Defendants to violate Plaintiff's constitutional rights. Rather, Plaintiff predicates his conspiracy allegation on his dissatisfaction with responses to his numerous HNRs or the handling of his grievances. That is not sufficient to support that two or more Defendants conspired to violate his constitutional rights. Accordingly, Plaintiff's conspiracy allegations will be dismissed.

### D.      Pattern, Policy, or Custom

Plaintiff alleges that he repeatedly complained of pain to various staff, who failed to effectively address his pain. On that basis, Plaintiff asserts that there is a pattern, policy, or custom of delaying or denying treatment of pain. Plaintiff fails to allege facts sufficient to show that a specific policy or practice was a "'moving force'" behind any specific instance of alleged deliberate indifference. See Lancaster v. City of Reno, 479 Fed. Appx. 774, 774-75 (9th Cir. 2012) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985) (to state an official capacity claim, plaintiff must show that a specific policy or custom was the "moving force" behind unconstitutional conduct)).[17] Plaintiff fails to allege facts to support the existence of a policy, practice, or custom of denying effective pain treatment to inmates, as opposed to careful control on the provision of medications highly susceptible to abuse in an incarceration setting. Rather, Plaintiff makes only vague and conclusory assertions of an unconstitutional policy, practice, or custom. While pro se pleadings are liberally construed, Haines, 404 U.S. at 520-21, conclusory and vague allegations will not support a cause of action. Ivey, 673 F.2d at 268. Further, a liberal interpretation of a civil rights complaint may not supply essential

---

[17] In Graham, the Court stated that "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" 473 U.S. at 165 (quoting Monell, 436 U.S. at 690 n.55). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Id. at 166. As discussed herein, Plaintiff has not named an entity, such as Maricopa County, as a defendant.

1   elements of the claim that were not initially pled.  Id.  Because Plaintiff fails to allege facts

2   to support the existence of an unconstitutional policy, practice, or custom, Plaintiff fails to

3   state a claim on the basis of such alleged unconstitutional policy, practice, or custom or to

4   connect such alleged policy, practice, or custom to any Defendant.  See Hydrick v. Hunter,

5   669 F.3d 937, 942 (9th Cir. 2012) (plaintiff failed to allege a specific policy implemented by

6   defendants or a specific event or events instigated by the defendants that led to purportedly

7   unconstitutional searches).  These allegations will be dismissed.

8   **V.      Claim for Which an Answer Will be Required**

9           Plaintiff also sues PA Barker, PA Johnson, and Dr. Gaskins.  He alleges that Barker

10  discontinued Ultram and Baclofen and denied renewal of Soma on February 8, 2012 without

11  providing or addressing alternative medications or treatment for Plaintiff's pain.  Plaintiff

12  alleges that Dr. Gaskins, in effect, denied him medically appropriate treatment for his pain by

13  failing to prescribe effective medications.  Plaintiff alleges that PA Johnson responded to

14  Plaintiff's request for Vicodin as suggested by Dr. Gaskins by responding that he did not see

15  anything for extra-strength Vicodin and suggesting that Plaintiff purchase over-the-counter

16  pain relievers.  Plaintiff sufficiently alleges that these Defendants acted with deliberate

17  indifference to his serious medical need, pain.  Accordingly, these Defendants will be required

18  to respond to the Complaint.

19  **VI.     Motion, Supplement, Declarations, Notice, and Affidavits**

20          Plaintiff has filed a motion for appointment of counsel.  Plaintiff seeks the appointment

21  of counsel because his chronic pain makes it difficult to write, the complexity of the issues,

22  and inability to retain counsel.  Counsel is only appointed in a civil rights action in

23  "exceptional circumstances."  Agyeman v. Corrections Corp. of America, 390 F.3d 1101,

24  1103 (9th Cir. 2004); Wilborn v. Escalderon, 789 F.2d 1328, 1331 (9th Cir. 1986); Terrell v.

25  Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991).  "A finding of exceptional circumstances

26  requires an evaluation of both 'the likelihood of success on the merits [and] the ability of the

27  [plaintiff] to articulate his claims *pro se* in light of the complexity of the legal issues

28  involved.'"  Wilborn, 789 F.2d at 1331; see Agyeman, 390 F.3d at 1103; Terrell, 935 F.2d at

1   1017.

2        Plaintiff has neither alleged nor shown exceptional circumstances warranting the
3   appointment of counsel.  Further, the legal issues involved in this case do not present
4   exceptional circumstances and Plaintiff appears able to articulate his claims.  Therefore,
5   Plaintiff's motion for appointment of counsel will be denied.

6        Plaintiff has also filed a Supplement, Declarations, a Notice, and Affidavits.  In the
7   Supplement, Plaintiff indicates that he wishes to assert state law claims.  If Plaintiff wishes
8   to add claims to this action, he must comply with Rule 15 of the Federal Rules of Civil
9   Procedure.  Rule 15(a) provides that a party may amend his pleading once as a matter course
10  within 21 days after serving it, or if the pleading is one to which a responsive pleading is
11  required, 21 days after service of a responsive pleading or 21 days after service of a motion
12  under Rule 12(b), (e), or (f), whichever is earlier.  LRCiv. 15.1 requires that a party seeking
13  leave to amend submit a proposed amended pleading on the court-approved form.  Plaintiff
14  has not complied with Rule 15(a) by filing an amended complaint on the court-approved form
15  complaint.  The Court will disregard the Supplement to the extent that any relief is sought
16  therein.

17       Plaintiff has also filed Declarations, a Notice, and Affidavits apparently seeking an
18  order requiring one or more Defendants to show cause why injunctive relief should not be
19  granted.  To seek injunctive relief or request any action by the Court must be in the form of
20  a motion that complies with the Rules of Practice of the United States District Court for the
21  District of Arizona (the Local Rules).  To obtain injunctive relief, the moving party must show
22  "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the
23  absence of preliminary relief, that the balance of equities tips in his favor, and that an
24  injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22
25  (2008); Am. Trucking Assoc., Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir.
26  2009).  In addition, the "serious questions" version of the sliding scale test for preliminary
27  injunctions remains viable after the Supreme Court's decision in Winter.  Alliance for the
28  Wild Rockies v. Cottrell, 632 F. 3d 1127, 1134-35 (9th Cir. 2011).  Under that test, a

TERMPSREF

1   preliminary injunction is appropriate when a plaintiff demonstrates that "serious questions
2   going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor."
3   Id. (citing Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).  That
4   approach requires that the elements of the preliminary injunction test be balanced, so that a
5   stronger showing of one element may offset a weaker showing of another.  "For example, a
6   stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood
7   of success on the merits."  Alliance for the Wild Rockies, 632 F.3d at 1135.  A plaintiff must
8   also satisfy the other Winter factors, including the likelihood of irreparable harm.  Id.  The
9   moving party has the burden of proof on each element of the test.  Environmental Council of
10  Sacramento v. Slater, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

11      In addition, a temporary restraining order without notice may be granted *only* if
12  "specific facts in an affidavit or verified complaint clearly show that immediate and
13  irreparable injury, loss, or damage will result to the movant before the adverse party can be
14  heard" and the movant certifies to the court in writing any efforts made to give notice and the
15  reasons that notice should not be required.  Fed.R.Civ.P. 65(b).  Further, "[t]he court may only
16  issue a preliminary injunction on notice to the adverse party."  Fed.R.Civ. P. 65(a)(1).

17      Plaintiff has not filed a motion seeking injunctive relief.  Further, no Defendant has
18  been served with the Complaint or appeared in this action.  Therefore, to the extent that
19  Plaintiff seeks any relief in his Declarations, Notice, or Affidavits, such relief will be denied.

20  **VII.   Warnings**

21      **A.      Release**

22      Plaintiff must pay the unpaid balance of the filing fee within 120 days of his release.
23  Also, within 30 days of his release, he must either (1) notify the Court that he intends to pay
24  the balance or (2) show good cause, in writing, why he cannot.  Failure to comply may result
25  in dismissal of this action.

26      **B.      Address Changes**

27      Plaintiff must file and serve a notice of a change of address in accordance with Rule
28  83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other

1  relief with a notice of change of address.  Failure to comply may result in dismissal of this
2  action.

3      **C.    Copies**

4      Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy
5  of every document that he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate
6  stating that a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit
7  an additional copy of every filing for use by the Court.  See LRCiv 5.4.  Failure to comply
8  may result in the filing being stricken without further notice to Plaintiff.

9      **D.    Possible Dismissal**

10      If Plaintiff fails to timely comply with every provision of this Order, including these
11  warnings, the Court may dismiss this action without further notice.  See Ferdik v. Bonzelet,
12  963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to
13  comply with any order of the Court).

14  **IT IS ORDERED:**

15      (1)    Plaintiff's Application to Proceed *In Forma Pauperis* is **granted**.  (Doc. 2.)

16      (2)    As required by the accompanying Order to the appropriate government agency,
17  Plaintiff must pay the $350.00 filing fee and is not assessed an initial partial filing fee.

18      (3)    Defendants Friedman, Belcourt, Kramer, Davis, Saretsky, Brooks, Hernandez,
19  Alvarez, Norma Doe, Risk Management Supervisor Doe, and Does LS865, CS959, CS533,
20  RT125, CS995, CS157, CH606 (or 686), CH741, HS556, HS217, CS565, HS212, 138776,
21  182045, 182409, and 185336 are **dismissed** without prejudice.

22      (4)    Defendants Barker, Gaskins, Johnson, must answer Count I.

23      (5)    The Clerk of Court must send Plaintiff a service packet including the Complaint
24  (Doc. 1), this Order, and both summons and request for waiver forms for Defendants Barker,
25  Gaskins, and Johnson.

26      (6)    Plaintiff must complete and return the service packet to the Clerk of Court
27  within 21 days of the date of filing of this Order.  The United States Marshal will not provide
28  service of process if Plaintiff fails to comply with this Order.

(7)   If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 120 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.   Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(i).

(8)   The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(9)   The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.  **The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must**:

(a)   personally serve copies of the Summons, Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

(b)   within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant. The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(10)   **A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff.**

(11)   Defendant must answer the Complaint or otherwise respond by appropriate

1   motion within the time provided by the applicable provisions of Rule 12(a) of the Federal

2   Rules of Civil Procedure.

3       (12)    Any answer or response must state the specific Defendant by name on whose

4   behalf it is filed.  The Court may strike any answer, response, or other motion or paper that

5   does not identify the specific Defendant by name on whose behalf it is filed.

6       (13)    Plaintiff's motion for appointment of counsel is **denied**.  (Doc. 5.)

7       (14)    Plaintiff's Supplement, Declarations, Notice, and Affidavits are **denied** to the

8   extent that any relief is sought therein.  (Doc. 6-11.)

9       (15)    This matter is referred to Magistrate Judge Lawrence O. Anderson pursuant to

10  Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as

11  authorized under 28 U.S.C. § 636(b)(1).

12      DATED this 1st day of July, 2013.

13

14

15

16                              David G. Campbell
                                United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28